1  MELINDA HAAG (CABN 132612)
   United States Attorney
2
   DAVID R. CALLAWAY (CABN 121782)
3  Chief, Criminal Division

4  ROBIN L. HARRIS (CABN 123364)
   LLOYD FARNHAM (CABN 202231)
5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7200
       Fax: (415) 436-7234
8      robin.harris2@usdoj.gov
       lloyd.farnham@usdoj.gov
9
   Attorneys for the United States
10
                        UNITED STATES DISTRICT COURT
11
                       NORTHERN DISTRICT OF CALIFORNIA
12
                              SAN FRANCISCO DIVISION
13

14 | UNITED STATES OF AMERICA, | ) | CASE NO. CR 12-0278 EMC |
   |---|---|---|
15 |     Plaintiff, | ) ) | **UNITED STATES' TRIAL MEMORANDUM AND PRETRIAL CONFERENCE STATEMENT** |
16 |     v. | ) ) | **(RULE 17.1-1(b))** |
17 | JAMES MURRAY, | ) ) | Trial Date:     September 21, 2015 |
18 |     Defendant. | ) ) | Pretrial Date:   September 1, 2015 Court:        Hon. Edward M. Chen |
19 |   | ) |   |

UNITED STATES' TRIAL MEMORANDUM
CR 12-0278 EMC

Pursuant to Criminal Local Rule 17.1-1(b) and the Court's Amended Pre-trial Order, the United States respectfully submits the following Trial Memorandum.

## I. STATUS OF THE CASE

### A. CHARGES

The Fourth Superseding Indictment alleges that defendant James Murray engaged in a scheme to defraud that began in 2007 and continued until well after defendant's arrest on March 13, 2012. Dkt. 278. The scheme defrauded various types of victims in various ways, but throughout there were common entities, methods and characteristics. These common elements include: (1) the misuse of credit cards and merchant accounts to fraudulently obtain large amounts of money; (2) online and electronic transactions using other people's identities or the phony accounting firm Jones, Moore & Associates (JMA); (3) misrepresentations to investors, bankers and others regarding the assets and historical performance of Market Neutral Trading (MNT), the purported hedge fund Murray formed to solicit investors, and (4) using false documents or misrepresentations to open accounts or obtain trading authorization for accounts opened in the name of MNT.

The Indictment charges 16 counts of wire fraud in violation of 18 U.S.C. § 1343 (counts 1-16), relating to four aspects of defendant's scheme: (1) fraudulently charging and refunding credit cards for large payments to JMA's and other merchant accounts; (2) soliciting investors for MNT through false audit reports and marketing materials; (3) establishing a trading account with Interactive Brokers in the name of Event Trading using an altered bank account statement; and, (4) making false representations and material omissions to Oppenheimer to open an account in the name of MNT in order to conduct a short- sale trade of Netflix stock. The Indictment also charges four counts of money laundering in violation of 18 U.S.C. § 1957 (counts 17-20), each related to the transfer of the illicit profits from the Netflix stock trade. The Indictment further alleges aggravated identity theft pertaining to two individuals (Lisa Brigulio and Giovanni DiFrancisci—counts 21-22) in violation of 18 U.S.C. § 1028A. Finally, the Indictment charges the defendant with contempt of court in violation of 18 U.S.C. § 401(3) (count 23). The contempt charge relates to defendant's violation of this Court's July 18, 2013 pre-trial release order.

### B. CUSTODY STATUS

On March 27, 2012, Magistrate Judge Cousins released the defendant on a $750,000 bond partially secured by property posted by defendant's father (Michael Murray) and defendant's brother (Matt Murray), both of whom served as sureties. On October 3, 2012, Judge Cousins remanded defendant into custody following the government's motion to revoke which was based on numerous violations of the terms and conditions of the original bond. On October 16, 2012, Judge Cousins issued a written order amplifying on his reasons for revoking defendant's bond. Dkt 50. Following two lengthy evidentiary hearings requested by the defendant (held on October, 24, 2012 and December 18, 2012), Judge Cousins issued another order which concluded that the government proved by clear and convincing evidence that Murray violated the conditions of his release and that defendant is unlikely to abide by any conditions of release. Dkt 82.

Defendant appealed Judge Cousins' revocation order to this Court. On July 18, 2013, this Court issued an order releasing defendant pursuant to certain explicit conditions, including: (1) no access to a cell phone and defendant could only make telephone calls at his attorney's office related to his defense in which defense counsel participated; (2) no contact with Mr. DiFrancisci; (3) no computer or other means of accessing the Internet; (4) no use or access to credit cards; (5) no trading through third parties or giving of financial advice. During the July 18, 2013 hearing, the Court also prohibited defendant from conducting any financial trading. Dkt 150, at 14-16. Defendant was released to a Halfway House at 111 Taylor Street on July 19, 2013.

On February 27, 2014, this Court remanded defendant into custody, following the government's proffer concerning serious violations of the Court's July 18, 2013 release order. Dkt 157 (minute entry). The defendant's violation of the Court's July 18, 2013 order is charged as contempt of court in count 23 of the Indictment.

### C. TRIAL STATUS

Trial is scheduled to begin on September 21, 2015, and a pretrial conference is set for September 1, 2015. The government estimates that its case-in-chief will require approximately 16 trial days to present.

## II. STATEMENT OF EVIDENCE

### A. FACTS

The United States alleges that, beginning in approximately 2007 and continuing until at least February, 2014, defendant James Murray, through his control of JMA—which the government expects to prove was a fictitious accounting firm controlled by Murray—and in his role as the sole investment advisor of MNT and as a participant in another entity called Event Trading committed wire fraud, money laundering, aggravated identity theft and contempt of court. Specifically, the government expects to prove that Murray defrauded various merchant banks, including Chase Paymentech, by submitting refund requests to merchant banks for credit card charges processed through JMA's merchant account without disclosing that JMA was not a legitimate merchant business and there were no funds in the JMA merchant account to cover the refund requests (counts 1-4). The government expects to prove that JMA was not a legitimate accounting firm or merchant business and was instead a sham entity controlled by Murray with the following evidence: (1) On December 22, 2008, JMA entered into a Virtual Office Agreement with Brandywine Executive Center (BEC) in Wilmington Delaware to serve as a virtual office by providing voice mail and mail forwarding services for JMA. All mail for JMA was forwarded by BEC to another virtual office (Regus) located in San Rafael, CA. The virtual office in San Rafael (Regus) in turn was instructed to forward all mail it received for JMA to Murray's home address in Larkspur, California; (2) the merchant account application that was submitted to Chase Paymentech for JMA listed Murray as the CFO of JMA; (3) Murray was not a CPA or accountant; (4) the audits supposedly conducted by JMA were false and were not based on the actual data from MNT's performance during the various years in question.

The government also alleges that Murray defrauded victims who invested in defendant's MNT Hedge Fund (counts 5-11) by soliciting them with materially false information, including fake audit reports about MNT's historical performance that were supposedly prepared by JMA when, in fact, JMA was not an accounting firm, conducted no audits of MNT and was, in actuality, a sham entity controlled by Murray. The government also expects to prove that Murray defrauded investors by misrepresenting his educational background and falsely inventing a graduate degree for himself from the University of Arizona that he did not earn. The government will prove through a summary of the bank and financial

records of MNT that Murray also misappropriated investor monies by transferring some of the investors' money to a newly formed entity in the Cayman Islands, which transfer was never disclosed to or agreed to by the investors.

The government further alleges and expects to prove that Murray, as CFO of MNT, defrauded a New York headquartered investment bank (Oppenheimer & Co). On February 2, 2012, Murray submitted an application to Oppenheimer for a new trading account in the name of MNT. Murray falsely represented that MNT had $5 million in assets available to invest when, in fact, MNT had nothing close to $5 million in assets in February 2, 2012. Moreover, paragraph 29 of Oppenheimer's new account application required Murray to notify Oppenheimer of any material changes from the time of submitting the application (February 2, 2012) to the time the account was cleared for trading (June 22, 2012). Murray failed to inform Oppenheimer that in May, 2012 all of MNT's assets held in an Interactive Broker's account were seized by the federal government pursuant to a seizure warrant; thus, MNT had *no* assets available to invest at the time the account was cleared for trading. Murray also failed to inform Oppenheimer that he was under indictment for fraud in connection with his role at MNT and that he had also been sued by the SEC for fraud based on his activities at MNT. Oppenheimer employees are expected to testify at trial that they would not have cleared the MNT account for trading if they had been notified that after February, 2012 when the application was submitted for MNT to Oppenheimer, Murray was charged in a federal indictment with wire fraud relating to his activities with MNT; that MNT's assets had been seized pursuant to a federal seizure warrant; and that MNT did not have $5 million in actual, available assets to invest.

The government will also prove that Murray on July 17, 2012, defrauded Interactive Brokers by electronically transmitting a new account application for an entity called Event Trading (count 11). The government will present evidence that will prove that Murray was a participant in Event Trading, but concealed his role in the company from Interactive Brokers (IB). The new account application included an altered Discover Money Market statement that falsely listed Giovanni DiFrancsci as the account holder when, in fact, the true account holder was the defendant. The evidence will show that IB's new account application form required applicants to confirm whether (1) any of its officers or authorized traders had ever been the subject of an investigation or proceeding by, among other regulatory

UNITED STATES' TRIAL MEMORANDUM
CR 12-0278 EMC

authorities, the SEC and (2) any of the principals, officers or authorized traders had ever been arrested for, or convicted of a crime. Of course, as of July 17, 2012, defendant had been sued by the SEC and had been arrested for federal crimes.

The government will further prove that on July 24 and 25, 2012, Murray, using MNT's Oppenheimer account, executed a short-sale trade involving 50,000 shares of Netflix stock that had been borrowed by Oppenheimer based upon Murray's representation that MNT had $5 million in assets available to invest. The short-sale Netflix trade resulted in a gain of approximately $410,000 for MNT.

The government will further prove through bank records, emails and other documents that Murray committed wire fraud (counts 13-16) in connection with the false representations to Oppenheimer and the diversion of the profits after the successful trade. Murray laundered $150,000 of the profits of MNT's Netflix trade through his then-criminal defense attorney, Garrett Zelen's, attorney-client trust account (counts 17-20). Specifically, the government expects to prove that on August 9, 2012, Murray directed Oppenheimer to wire transfer $150,000 from the Netflix trade to Zelen's attorney-client trust account. Thereafter, on August 15, 2012, at Murray's direction, Zelen transferred $100,000 of the Netflix proceeds from Zelen's attorney-client trust account to the defendant's father's bank account. The very next day, on August 16, 2012, the defendant's father (Michael Murray, who was also a surety on both bonds the court authorized for defendant), again acting on defendant's direction, wire transferred $15.000 to defendant's personal bank account at Discover Bank and $50,000 to the Event Trading account at IB, which had previously been opened using a fraudulent bank statement (*see* count 12).

The government intends to introduce the fee agreements between Murray and Zelen along with Zelen's attorney-client trust records. These documents will be used to prove that the laundering of the $150,000 through Zelen's account was not related to attorney's fees supposedly owed to Zelen by Murray. Moreover, the multiple transfers of money (along with the $50,000 that Zelen kept from the Netflix trade), strongly support the charge that Murray was concealing the source of the ill-gotten Netflix gains through Zelen.

The government will demonstrate that defendant sent or caused to be sent 16 wires in furtherance of his scheme to defraud. The parties anticipate reaching a stipulation that all of the charged wires

travelled in interstate commerce.

The defendant is also charged with aggravated identity theft in counts 21 and 22. Specifically, the government expects to prove that defendant misappropriated his estranged wife's California Driver's License (which was issued in her maiden name, Lisa Brigulio) to facilitate the opening of the JMA virtual office which "office" was used in the scheme to defraud merchant banks as charged in counts 1-4 of the Indictment. Count 22 charges the defendant with misusing Giovanni DiFrancisci's name to create a phony Discover Bank statement which bank statement was used to open the Event Trading account with IB as charged in count 12 of the Indictment.

As is discussed elsewhere in this memorandum, pursuant to this Court's July 18, 2013 order, defendant was released from custody to the Halfway House at 111 Taylor Street. The Court imposed numerous conditions in its written order. The government intends to prove that defendant violated this Court's order in various ways, including by procuring a computer tablet with Internet capability, hiding that computer tablet in the ceiling of a conference room he was permitted to use at the Pillsbury law firm, using the computer to communicate with Giovanni DiFrancisci and Gian Luca DiFrancisci via Skype and Viber, using an application called "cloud magic" to secretly monitor the emails of his estranged wife, Lisa Murray, and attempting to activate a trading account in the name of MNT by using an altered water bill. The government will introduce forensic evidence concerning the defendant's near constant use of the contraband computer to communicate with Giovanni DiFrancisci, a witness and charged victim in the case; attempt to fabricate an after-the-fact "side pocket agreement" that would purportedly justify the Netflix trade and laundering of profits; research into various countries' extradition treaties and the unauthorized cyber-stalking of his estranged wife who is a witness and charged victim (count 21) in this case. The government also expects Pillsbury personnel to testify about defendant's clandestine efforts to access the Internet at the law firm by sneaking onto a computer in a near-by conference room in the time period before defendant was able to procure his own contraband computer tablet.

B.   **DEFENDANT'S STATEMENTS**

The government intends to use, in its case-in-chief, numerous prior statements made by defendant. These include, but are not limited to, oral and written statements defendant made in a prior

1  civil deposition, emails, statements he made to witnesses in the case and statements defendant made in
2  recorded jail calls.

3  These various statements are not hearsay. Many will be introduced not for the truth of the matter
4  asserted but for the fact that defendant or his agent made the statements. To the extent they are
5  introduced for the truth of the matter asserted, they are covered by Federal Rule of Evidence 801(d) as
6  statements by a party opponent, in his individual capacity, *see* Fed. R. Evid. 801(d)(2)(A), or by an
7  authorized agent of defendant acting within the scope of his relationship, *see* Fed. R. Evid.
8  802(d)(2)(C)–(D). We respectfully note that the defendant cannot introduce his own out of court
9  statements via cross-examination of government witnesses or in the defense case-in-chief because those
10 statements, if introduced by the defendant, are hearsay.

11 **III.   PRE-TRIAL DISCLOSURES**

12 **A. JENCKS, BRADY AND GIGLIO DISCLOSURE (Crim. L. R. 17.1-1(b)(1–3)).**

13 The United States has already provided reports of interviews and emails of witnesses it intends to
14 call at trial. The government has provided to defendant copies of all currently available reports of law
15 enforcement authorities in its possession. As new reports are obtained, they will be provided to the
16 defense. The United States believes that it has supplied all materials that may be relevant as *Brady*
17 material, if any, and recognizes its obligation to continue to provide any such materials within its
18 possession, custody, or control. The government also understands its continuing duty to comply with
19 Rule 16 and will do so.

20 As of this date, the United States is not aware of any exculpatory material or impeachment
21 information concerning the witnesses expected to testify in its case-in-chief that would be subject to
22 disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150
23 (1972), *United States v. Bagley*, 473 U.S. 667 (1985), and/or *United States v. Henthorn*, 931 F.2d 29
24 (9th Cir. 1991), that has not already been provided or disclosed to the defense.

25 Despite repeated requests for it, the United States has received neither reciprocal discovery from
26 defendant pursuant to Federal Rule of Criminal Procedure 16(b) nor witness statements from defendant
27 pursuant to Federal Rule of Criminal Procedure 26.2. The United States requests that defendant be
28 directed to comply with Rule 26.2 as appropriate. The United States understands that defendant has

subpoenaed documents and records from other witnesses, and requests that this Court enforce the reciprocal discovery obligations of Rule 16(b) and that defendant be prohibited from introducing into his case-in-chief at trial any evidence, witness statements, or other items covered by defendant's reciprocal discovery obligations that he has not provided to the government.

The United States has also not received any expert disclosures from defendant. The government requests, also pursuant to Rule 16, that defendant be prohibited from introducing into evidence in his case-in-chief any expert testimony for which he has not provided timely notice through an appropriate expert disclosure.

**B.  STIPULATIONS AND NOTICE PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11) (Crim. L.R. 17.1-1(b)(4)).**

At present, the parties anticipate reaching stipulations with defendant concerning the jurisdictional interstate commerce nature of the wires charged in counts 1-16. The defense has also indicated that it will stipulate to the authenticity of the recorded jail calls the government will introduce at trial. The government will ask the Court for a finding of non-hearsay and authenticity for various case filings in this case and business records for which custodians have provided the proper affidavit as required by the Federal Rules of Evidence.

**C.  NEED FOR INTERPRETERS (Crim. L.R. 17.1-1(b)(5))**

The testimony of one witness (David Lowe) has already been preserved pursuant to Federal Rule of Criminal Procedure 15, and his testimony did not require the use of an interpreter. The government expects that he will be unavailable for trial and that the admissible portions of his video deposition will be played to the jury instead. The government does not anticipate requiring interpreters for the remaining witnesses it intends on calling at trial.

**D.  DISMISSAL OF COUNTS AND ELIMINATION OF CERTAIN ISSUES (Crim. L.R. 17.1-1(b)(6).**

The United States does not anticipate dismissing any counts, but will do so expeditiously if it determines that dismissal is in the interests of justice. The United States is not aware of any issues that can be eliminated prior to trial.

**E.  JOINDER/SEVERANCE ISSUES (Crim. L.R. 17.1-1(b)(7)).**

The defendant has conceded that count 23 (contempt of court) was properly joined with the other

1  counts in the Indictment.  Defendant's Rule 14 severance motion was recently denied by the Court.

2  **F.     INFORMANTS/PRIOR CONVICTIONS (Crim. L.R. 17-1(b)(8)).**

3  The United States may rely on a cooperating witness whose identity and known *Giglio* material
4  has been produced.  None of the government's witnesses, other than the cooperating witness is known to
5  have prior convictions, and the government will inform the defense if it learns of any.

6  **G.     WITNESS LIST (Crim. L.R. 17.1-1(b)(9)).**

7  The United States is filing its proposed witness list separately.

8  **H.     EXHIBIT LIST (Crim. L.R. 17.1-1(b)(10)).**

9  The United States is filing its proposed exhibit list separately.

10 **I.     OBJECTIONS TO EXHIBITS OR TESTIMONY (Crim. L.R. 17.1-1(b)(11)).**

11 Defendant has not informed the government of its intent to use any particular exhibits or
12 testimony at trial.  The parties have filed motions *in limine* regarding the admissibility of certain
13 testimony or exhibits at trial.

14 **J.     LEGAL ISSUES LIKELY TO ARISE AT TRIAL (Crim. L.R. 17.1-1(b)(12)).**

15 To the extent anticipated by the government, these are addressed in the motions *in limine* and our
16 expected responses to defendant's motions *in limine*.

17 **K.     PROPOSED VOIR DIRE (Crim. L.R. 17.1-1(b)(14)).**

18 The United States is filing its proposed jury voir dire separately.

19 **L.     PROPOSED JURY INSTRUCTIONS (Crim. L.R. 17.1-1(b)(14)).**

20 The United States is filing its proposed jury instructions separately.

21 DATED: August 13, 2015                          Respectfully submitted,

22                                                 MELINDA HAAG
                                                   United States Attorney
23                                                 _____/s/_____
24                                                 ROBIN L. HARRIS
                                                   LLOYD FARNHAM
25                                                 Assistant United States Attorneys

26

27

28

UNITED STATES' TRIAL MEMORANDUM
CR 12-0278 EMC

10